Filed 5/28/24  P. v. Saldana CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B327420 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA092407) |
| v. | |
| ENRIQUE ISMAEL SALDANA, | Order Modifying Opinion and Denying Petition for Rehearing |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered the opinion filed herein on May 15, 2024, be modified as follows:

On page 2, the sentence under the heading "Background," beginning with "After a jury trial," is deleted in its entirety, and the following sentence is inserted in its place: "After a jury trial with codefendant Eduardo Galicia in 2011, defendant was convicted of three counts of attempted murder (§§ 664/187, subd. (a)) and other offenses.

The request of the court to order the superior court to prepare an amended abstract of judgment correcting errors in the abstract filed November 30, 2011, is denied.  We note a corrected abstract was issued and filed February 28, 2013, in Superior Court case No. KA092407-01, though not made a part of the appellate record.

There is no change in the judgment.

The petition for rehearing is denied.

_____

LUI, P. J.          ASHMANN-GERST, J.          CHAVEZ, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B327420 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA092407) |
| v. | |
| ENRIQUE ISMAEL SALDANA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Enrique Ismael Saldana (defendant) appeals the order denying his petition for vacatur of his murder conviction and resentencing under Penal Code section 1172.6 (formerly section 1170.95)[1] entered after an evidentiary hearing held pursuant to subdivision (d) of that statute. Defendant contends substantial evidence did not support the trial court's finding he directly aided and abetted the attempted murder with intent to kill. We reach a different conclusion, finding substantial evidence does support the trial court's order. We affirm the order.

## BACKGROUND

After a jury trial with codefendant Eduardo Galicia in 2011, defendant was convicted of three counts of attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a)) and other offenses. On November 29, 2011, he was sentenced to a prison term of 25 years. On direct appeal we affirmed the judgment in *People v. Saldana* (May 15, 2013, B238491) (nonpub. opn.).

In January 2022, defendant filed a petition for vacatur of his attempted murder convictions and resentencing pursuant to section 1172.6. The trial court appointed counsel for defendant, the prosecution filed a response to the petition, and after finding defendant's jury had been instructed on the natural and probable consequences theory of liability, issued an order to show cause why relief should not be granted under the statute. An evidentiary hearing pursuant to section 1172.6, subdivision (d) was held October 31, 2022. The prosecution submitted the

---

[1] All further unattributed code sections are to the Penal Code unless otherwise stated.

matter on the reporter's and clerk's transcripts of defendant's 2011 trial, omitting any hearsay, as well as the procedural portion of the appellate opinion.  Defense counsel presented defendant's testimony at the hearing.

**Relevant 2011 trial evidence[2]**

### *Ramirez testimony*

Salvador Ramirez testified that on October 27, 2010, about 3:30 p.m., he was walking with his brother Rafael Hernandez and friend Daniel Gonzalez near Garey High School.  As they approached the Taqueria de Anda, Ramirez saw a car driven by a male.  The driver parked the car in front of them in the driveway of the restaurant, blocking their path.  Ramirez thought he also saw two or three men in the backseat and a female occupant.  All the occupants were making gang signs and giving Ramirez and his companions bad looks.  The two men in the back, "Sicko" and "Lalo," got out of the car, approached Ramirez and asked if he was still from "guppies," meaning "Krazy Krowd" or "KC," the tagging crew associated with the 12th Street gang.  Ramirez had seen them before and identified codefendant Galicia, also known as Lalo, in court.  Ramirez knew Galicia because they had gone to school together.  Ramirez also identified photographs of Galicia and Sicko in a photographic lineup.

Galicia and Sicko both started punching Ramirez, who fought back while Hernandez and Gonzalez stood by and watched.  The driver got out of the car and said, "I'm the driver," and left.  Sicko and Galicia ran back to the car, pulled out guns, pointed and fired at Ramirez and his companions, who began

---

[2]     At the People's request, we have taken judicial notice of the relevant portions of the original trial transcript, which were not included in the current record on appeal (submitted in electronic form).

3

running away.  Ramirez did not see the driver with a gun and did not see his face well.

### *Gonzalez testimony*

Gonzalez testified he was walking with Ramirez and Hernandez, carrying a nine-millimeter handgun in his belt, when he saw the car with occupants giving them angry stares.  When two men got out of the car, they said, "this is Olive Street," and asked Ramirez if he was still "kicking it with the guppies" (a derogatory term for 12th Street).  One of the men started punching Ramirez, who fought back, while the other man tried, unsuccessfully, to join the fight.  Gonzalez and Hernandez stood about five or six feet away during the fight.  When Ramirez appeared to be getting the best of his assailants, Gonzalez lifted his shirt to display his gun but did not take it out.  The two men appeared to see it, returned to their car, and retrieved guns, one black and one silver, as another man in a passenger seat displayed a gun.  With guns pointed at them, Ramirez, Gonzalez and Hernandez started running.  The two men chased after them.  Gonzalez did not see them fire but heard about three or four gunshots.  After he heard the first gunshot, he took out his gun and fired it once into the air.

### *Hernandez testimony*

Hernandez's testimony about the incident was largely consistent with the testimony given by Ramirez and Gonzalez, with some additional details and recollections.  Hernandez testified one of the two men who got out of the car came from the front passenger seat, and the other came from a back seat.  Hernandez thought the driver was female but was not certain.  The occupants were "mad-dogging" his brother, giving him angry looks.  Ramirez had told Hernandez stories about the people in the car and said they did not like Ramirez.

4

As the two men approached, they said, "This is Pomona Sur Olive Street." Hernandez understood the question to Ramirez about still being a "guppy" to mean whether he was a member of 12th Street. Hernandez identified Galicia in court as one of the two men in the car and testified the other man had tattoos near his eyes. Hernandez saw both men take swings at Ramirez, who fought back against both. When the fight stopped, Hernandez only saw Galicia go back to the car and pull a gun from the front passenger seat that he then pointed and fired at Hernandez and his companions approximately five or six times. As he was running away, Hernandez saw Gonzalez pull out his gun and fire it once in the air.

### *Defendant's police interview*

Pomona Police Department Detective Freeman testified that an anonymous source provided a partial license plate number of the shooters' car, and the day after the shooting he and his partner Detective Berger observed it being driven by defendant in Olive Street gang territory. They followed the car until defendant parked in an alley and got out. When the detectives approached and said they wanted to speak to him, defendant took two steps toward them, looked around, and fled. Detective Berger gave chase on foot, and Detective Freeman was able to catch up with defendant in their car. Defendant was detained, patted down, and six .22-caliber bullets were found in his pocket. Detective Freeman asked defendant where his gun was. Defendant explained where he had thrown it during the foot chase. It was recovered from the roof of a nearby house.

After arresting defendant and advising him of his *Miranda*[3] rights, Detectives Freeman and Berger interviewed him. The

---

[3] See *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

interview was video-recorded, and an audio portion was played for the jury.[4]

Defendant told Detective Freeman that on the morning of October 27, he met up with Sicko and Galicia who suggested they "go fishing." Defendant explained "fishing" meant to go on a mission looking for members of 12th Street. That afternoon they met up again. This time two girls, Vanessa and Lala, were in the car with them, and defendant was told to drive. Defendant drove to the area of Garey High School where Galicia and Sicko recognized "these kids" (Ramirez, Gonzalez, and Hernandez) and told him to pull over in front of them. Defendant complied and parked in the driveway near a Mexican restaurant. Asked why they chose these three individuals, defendant said they named them, saying, "Oh, that's so and so. That's somebody from . . . KC or some bullshit like that."

The girls stayed in the car while defendant, Galicia, and Sicko got out, approached them, and started fighting with one of them. Sometime before the fighting stopped, one of the three victims pulled out his gun, cocked it, and said, "Get the fuck out of here." The fighting stopped, and Galicia ran to the car and pulled out a .22-caliber revolver from the passenger area where the stereo used to be. Later defendant said there was only one gun in the car. Defendant and Sicko jumped into the car, and when Ramirez, Gonzalez, and Hernandez started running away, Galicia ran after them and fired about four or five times at them. As the three ran away, one of them pulled out a gun and fired.

Early in the interview defendant said that after the shooting Galicia told him to drive away from there, so he did. Later in the interview defendant said that Galicia jumped into

---

[4] We summarize the interview from the transcript of the interview.

6

the driver's seat and drove them away. Galicia put the gun in the dash, told defendant it was there, to take the car and to stash it away.

Defendant said he hangs out with these people because Sicko "banged on [him]," and he does not know anyone else in the area. Defendant added he did not like to say no to them because he was scared they might do something to him.

### Expert testimony

Detective Freeman testified as the prosecution's gang expert on gang culture and, in particular, the culture and practices of Olive Street. He testified that Olive Street members have been known to sell narcotics, commit carjacking, assaults, with and without deadly weapons, attempted murders, murders, car theft, witness intimidation, and putting up graffiti. Olive Street's biggest enemy or rival is 12th Street, who claims territory near Garey High School and the Taqueria de Anda.

Detective Freeman explained that, when a gang goes on a mission, it meant gang members getting together to commit an act of disrespect toward a rival gang. A mission could range from going into a rival neighborhood to spray paint the walls to targeting a rival gang member for murder. Olive Street used the term "fishing" to mean a mission to 12th Street's neighborhood for the purpose of assaulting or even killing 12th Street members.

## Defense evidence

Defendant did not testify at the 2011 trial. Galicia testified in October 2010 he was 16 years old and had been a member of Olive Street for six months. Sometime after he got home from school at 1:00 p.m. on the day of the shooting, Sicko, defendant, and two girls came to his home while he was asleep. He went outside to speak to them. Sicko suggested they cruise around, drink and smoke some weed, but Galicia said he was not feeling well and did not want to go. Sicko told him to stop "playing" him

7

like a "bitch." Not wanting to get beaten up, Galicia got in the car, and they headed to Garey High School to "punk some guppies." Galicia claimed not to think they were going to shoot people, did not know there was a gun in the car, never drove the car, and did not know how to drive. He testified that it was Sicko who recognized Ramirez, directed them to Taqueria De Anda, and said, "Let's get down with them," meaning to fight with them.

Galicia, Sicko, and defendant got out of the car and approached Ramirez and his companions. Sicko said something, and a fight ensued. Galicia claimed he was about to join the fight when a fat guy in a white T-shirt pulled a gun from his waist, pointed it at Sicko, cocked it, and told Sicko to go back to the car. Afraid, Galicia grabbed Sicko's hand, pulled him away, and they ran back to the car. Defendant then grabbed the gun from under the driver's seat, got out, and said something like, "Oh, what you guys gonna do, you know. I heard something." Despite one of the girls saying not to shoot, defendant walked quickly into the middle of the street and started shooting at them while the one with the gun still had his gun out. After defendant fired a shot, the three victims ran away, and after five more shots by defendant, the one with the gun fired one shot. Galicia denied ever shooting at anyone.

On cross-examination Galicia admitted he knew Ramirez and had gone to eighth grade with him. Galicia clarified he did not know there was a gun in the car when he was picked up but was "[p]retty sure" there must have been a gun in the car when they decided to go look for the enemy. He said only older "homies" carried guns, not younger Olive Street members. Galicia had previously been on three fishing missions for his gang and knew there was a gun, but having seen no guppies, no gun was taken out.

Although Galicia claimed Olive Street members used guns only for protection and not to kill anyone, he acknowledged that Olive Street members put in work for the gang by shooting rival gang members, and the more work one puts in, the greater the respect the member earns from the gang. If an Olive Street member did shoot a rival gang member, he would gain more respect than someone who sprayed graffiti on the wall.

**The section 1172.6 hearing**

In lieu of direct examination defendant made a statement under oath that on the day of the shooting his friends picked him up, and he was told to drive. Defendant ordinarily drove because he was one of the few of his friends who knew how to drive. Defendant claimed he and his friends did not intend to shoot or kill anyone, and he had no idea that guns were in the car. He did acknowledge that gang members usually carry guns. Defendant's companions grew up with the victims, and defendant barely knew his companions as he had only just started hanging around them. When defendant pulled up in front of the victims, his companions did not immediately get out of the car and start shooting. Rather the confrontation started as a fist fight but escalated because one of the victims pulled out a gun. The companions returned to the car, grabbed their gun and started shooting. Defendant claimed everything happened quickly and did not register, making it hard to remember. He had no idea a shooting was going to happen when it began as a fistfight.

On cross-examination defendant admitted being a "Pomona Sur Olive" gang member on the date of the shooting, that his gang had a rivalry with 12th Street, and that he was driving the car. He agreed to pull the car in front of the victims but, because he was busy driving, did not see whether the occupants in the back seat were making gang signs at the victims. He did hear them call out "this is Olive Street" and "this is Pomona Sur

9

Olive." Defendant did not initially get out of the car, but claimed he eventually got out in order to break up the fist fight. He saw Gonzalez display his gun but did not hear what Gonzalez said. When his companions ran back to the car, he saw them pull their guns from the back seat and then shoot at the victims. The reason he waited for them rather than driving away, he said, was he was afraid of retaliation. After the shooting, he drove his companions to safety without checking any of the victims for injury or their need for help. After the shooting, defendant stayed all night with his companions in a park because he did not have a place to stay. Defendant denied taking the gun Galicia used and ever brandishing a gun during the incident. Defendant denied that the gun he was caught with was the gun used by Galicia. He explained the gun he was caught with was a revolver.

Following the testimony, the trial court heard counsel's arguments and found defendant was guilty of attempted murder under current law, beyond a reasonable doubt, thereby denying defendant's section 1172.6 petition.

Defendant filed a timely notice of appeal from the order.

## DISCUSSION

Defendant contends the prosecution failed to prove beyond a reasonable doubt defendant harbored the requisite intent to convict him of the attempted murders.

Section 1172.6 provides a procedure for those convicted of murder, attempted murder, or manslaughter to seek retroactive relief if they could not be convicted under sections 188 and 189 as amended, effective January 1, 2019. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.) Here, as defendant made a prima facie showing of eligibility under the statute, the trial court properly proceeded to an evidentiary hearing under section 1172.6,

10

subdivision (d), at which the prosecutor was required to prove beyond a reasonable doubt that defendant remained guilty of attempted murder.[5]

On appeal from the denial of a petition after the hearing, we review the ruling for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) We view the evidence in the light most favorable to the court's order to determine whether any reasonable trier of fact could have made the same determination beyond a reasonable doubt. (*Ibid.*) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends," and we "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

---

[5] The hearing judge had also presided over defendant's 2011 trial.

11

"[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) "[T]o prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

Defendant has failed to carry his burden. The statement of facts in defendant's brief is taken entirely from the prosecution's summary in its opposition to the petition for resentencing and from his own testimony at the section 1172.6 hearing. In the argument section of his brief, defendant has summarized selectively chosen parts of Galicia's testimony. The trial court was not required to believe either witness or give particular weight to their testimony and may reject all or part of it. (See *People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1463.) Defendant has also summarized portions of the prosecution's closing argument at the 2011 trial and treated them as evidence. The statements and argument of counsel are not evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 793.)

We have reviewed the 2011 trial evidence and have found substantial evidence supports the trial court's ruling.

12

Quoting *People v. Lee* (2003) 31 Cal.4th 613, 624, defendant correctly states, "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill."

Compelling evidence established that Galicia was the shooter. He was identified as the shooter by Ramirez, whom Galicia admitted knowing since they were in the eighth grade together. Detective Freeman testified that Olive Street members used the term "fishing" to mean a mission to 12th Street's neighborhood for the purpose of assaulting or even killing 12th Street members. And Olive Street members are known to have committed assaults with a deadly weapon, attempted murders, and murders. "[E]vidence of motive is often probative of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Motive in gang shootings is reasonably inferred from hatred felt for rival gang members. (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.) When a gang member fires multiple shots at a group of people in rival gang territory it is reasonable to infer that he harbored an intent to kill. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.)

There is no doubt defendant aided and abetted the mission, as he drove the car to rival gang territory knowing the mission was "fishing" for 12th Street members and parked in a driveway to block the passage of the three victims on the sidewalk. The remaining issue is whether defendant aided and abetted Galicia's acts with the intent to kill. "'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the

13

defendant's acts and the circumstances of the crime.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

Defendant argues the evidence proved that his intent was not to kill but to go into rival gang territory with his fellow gang members and beat up their rivals. If Galicia had intended to kill, defendant argues, he would have taken a gun when he *first* exited the car. Defendant points out the prosecution's own gang expert testified that "go fishing" could mean *either* assault or kill rival gang members, apparently suggesting that this court should decide which one the evidence shows. Defendant concludes that the evidence did not prove the direct perpetrator intended to kill, and thus, it was insufficient to prove defendant as his aider and abettor, intended to kill.

Our task is not to determine whether there were circumstances that might reasonably support a finding contrary to the court's ruling. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1194, abrogated on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Moreover, we decline defendant's apparent invitation to overrule the rules of substantial evidence. Defendant has failed to summarize all material evidence in a light favorable to the prosecution. Instead he has summarized arguments suggesting it is evidence, disregarded evidence that is unfavorable to his argument, resolved conflicts and credibility issues, and has drawn inferences in his favor. Defendant argues that Galicia should have been believed when he proclaimed his intent only to assault, but he ignores Galicia's testimony that *defendant* was the shooter. Defendant's argument lacks logic. If Galicia's testimony is to be believed, it would demonstrate that defendant, not Galicia, was the direct perpetrator.

Defendant also ignores his own admissions. In his interview with Detective Freeman the day after the shooting, defendant admitted that "fishing" meant to go on a mission

14

looking for rival gang members, in this case, 12th Street members, and that he drove his fellow gang members on that mission on October 27, 2010. He told the detectives that when Galicia ran back to the car, he pulled out one of the *guns* from where the stereo used to be, choosing the .22-caliber revolver. A reasonable inference from these statements is that defendant knew a fishing mission could result in a shooting; he willingly went on the mission and drove there knowing there was more than one gun in the car (although he later said there was just one).

Gonzalez testified that when the two men went to the car to retrieve guns, a man in the passenger's seat displayed a gun. Defendant told Detective Freeman there were only three men on this fishing mission, himself, Galicia, and Sicko. Defendant initially got out of the car with the other two, and when guns came out, he jumped into the backseat with Vanessa. Thus when Gonzalez displayed his firearm, and Galicia and Sicko went for their guns, defendant was the only man in the car. As the trial court found, defendant was that man, and showing his firearm allowed his companions to arm themselves and respond with deadly force to Gonzalez's gun display.

A "shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill." (*People v. Smith, supra*, 37 Cal.4th at p. 742.) The most reasonable inferences to draw from the evidence were that defendant knew there were guns in the car, was himself armed with a gun, knew Galicia and Sicko were retrieving guns, intended to use them, and by assisting them to do so by displaying his gun, defendant shared the shooter's intent to use deadly force against the victims.

We conclude that substantial evidence supports the trial court's ruling such that any rational trier of fact could find the

15

defendant guilty of attempted murder beyond a reasonable doubt. (See *People v. Jones, supra,* 51 Cal.3d at p. 314.)

## DISPOSITION

The order denying the section 1172.6 petition is affirmed.


_____

CHAVEZ, J.

We concur:


_____

LUI, P. J.


_____

ASHMANN-GERST, J.